## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Justin Stern, Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI, and have been an agent since December 2004. As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia. Since completing training, I have participated in numerous criminal investigations, which have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, informants, seizure and analysis of computer information and various other techniques. I have investigated organized crime, drugs, gangs, violent crime, firearms, financial crime, and money laundering. I also investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of the aforementioned statutes. I am currently assigned in Boulder, Colorado, at an office within the FBI's Denver Division.

2. I make this affidavit in connection with an investigation relating to alleged violations of Title 18, U.S.C. § 2252, Certain Activities Relating to Material Involving the Sexual Exploitation of Minors; and Title 18, U.S.C. § 2252A, Certain Activities Relating to Material Constituting or Containing Child Pornography (hereinafter, the "Subject Offenses"). This affidavit is made in support of an application for a search warrant for an Apple iPhone 5 cellular telephone (hereinafter "Subject Phone"), described herein and in Attachment A, with items to be seized described in Attachment B.

**3.** As the primary Case Agent for this investigation, I am familiar with the facts of the case. The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; knowledge obtained from other individuals including law enforcement personnel; and my review of reports and other evidence. The information contained within this affidavit does not represent every fact learned by law enforcement during the course of the investigation but includes information sufficient to establish probable cause for the requested search warrant.

**4.** Based on the information below, I submit there is probable cause to believe that fruits, evidence and instrumentalities of the Subject Offenses as described in Attachment B, will be located on the Subject Phone, as described in Attachment A.

## RELEVANT STATUES

**5.** This investigation concerns alleged violations of Title 18 U.S.C. § 2252, Certain Activities Relating to Material Involving the Sexual Exploitation of Minors, and Title 18 U.S.C. § 2252A, Certain Activities Relating to Material Constituting or Containing Child Pornography. These statutes prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaged in sexually explicit conduct (child pornography).

## DEFINITIONS

**6.** The following definitions apply to this affidavit and Attachment B.

7. "Child pornography" includes the definition in 18 U.S.C. § 2256(8) - any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

8. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image [*see* 18 U.S.C. § 2256(5)].

9. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

10. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## IDENTIFICATION OF THE DEVICE TO BE SEARCHED

13. The Subject Phone is a black Apple iPhone 5 cellular telephone. The Boulder Police Department (BPD) is currently maintaining custody of the Subject Phone as item/property number 18183 at BPD's station, Property and Evidence Section, located at 1805 33rd Street, Boulder, Colorado 80301. In my training and experience, I know that the Subject Phone has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the phone first came into the possession of the BPD.

## INVESTIGATION

14. On June 1, 2019, at approximately 12:46 a.m., Boulder Police Department (BPD) Officer Cody Hartkopp responded to a call that public transit employees recovered an Apple iPhone containing child pornography. Specifically, Officer Hartkopp was dispatched to the vicinity of the Regional Transportation District (RTD), 1710 Exposition Drive, Boulder, Colorado. I have reviewed a copy of Officer Hartkopp's investigation of the matter, maintained in BPD case number 19-05931.

15. Officer Hartkopp interviewed "RTD employee 1," who was responsible for cleaning and servicing all buses upon their return to the terminal. On May 30, 2019, at approximately 11:41 p.m., RTD employee 1 began cleaning RTD bus number 3703 upon its return to the terminal. RTD employee 1 observed a black Apple iPhone (the Subject Phone) left on the dashboard between the steering wheel and windshield, a location where bus drivers leave forgotten property. Thereafter, RTD employee 1 notified an RTD supervisor and placed the Subject Phone on the RTD customer service counter and resumed cleaning.

16. "RTD employee 2"[1] and "RTD employee 3" then arrived to investigate the Subject Phone in an attempt to identify its owner. RTD employee 2 observed that the Subject Phone was unlocked and accessible. RTD employee 2 then unlocked the Subject Phone and was immediately taken to the Subject Phone's photos. RTD employee 2 observed that the Subject Phone's photos contained various child pornography. RTD employee 2 stated that s/he was familiar with child pornography via his/her former employment with Child Protective Services. Thereafter, RTD employee 2 notified an RTD supervisor; the pair then called the police.

17. After investigating the matter on-scene, Officer Hartkopp took the Subject Phone into BPD custody. Upon returning to BPD, Officer Hartkopp unlocked the Subject Phone and accessed its photos in the manner described by RTD employee 2. After reviewing contents of the Subject Phone's photos, Officer Hartkopp accessed the Subject Phone's security settings to look for any emergency content information and observed that the Subject Phone was logged into a particular Apple Account.

---

[1] Based on a query of the National Crime Information Center, RTD employee 2 had several arrests and two possible convictions for theft-related offenses in the 1990s.

18.     On June 20, 2019, Colorado State Judge Patrick Butler authorized a search warrant for the Subject Phone (search warrant number P19-5931). BPD Detective McNalley applied for the search warrant. Thereafter, pursuant to the state search warrant BPD accessed the Subject Phone, extracted and analyzed its contents. This affidavit intentionally omits any information or evidence derived from BPD's review of the contents of the Subject Phone.

19.     BPD has maintained custody of the Subject Phone since Officer Hartkopp seized the item to present. BPD is currently maintaining the Subject Phone as item/property number 18183 at the Boulder Police Department, 1805 33rd Street, Boulder, Colorado 80301.

## **INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND POSSESS, RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY**

20.     Based on my experience related to investigations involving child pornography and the sexual abuse of children, and from information imparted to me by other law enforcement officers, I have learned that individuals who possess, receive, distribute or access with intent to view child pornography have a sexual interest in children and in images of children. Based on the experience of other law enforcement officers with whom I have communicated, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video

tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

c. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

d. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic

format in a safe, secure, and private environment, including in cloud-based storage online or on their person. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, instant messaging, and other similar vehicles.

e. Some individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

f. Some individuals who collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in notebooks, on computer storage devices, or merely on scraps of paper.

g. Based on the training and experience of other law enforcement officers with whom I have had discussions, I know that persons in engaged in the production and

       possession of child erotica are also often involved in the production and possession of child pornography. Likewise, persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

    h. Based on my experience, and conversations with other law enforcement officers, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses. Additionally, based on this experience and these conversations, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21.     A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

22. Based on my experience, as well as information imparted to me by other law enforcement officers, I know that computer files or remnants of such files can be recovered

months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, that is, in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      23.     Also, again based on my experience, as well as information imparted to me by other law enforcement officers, I know that wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

24.     As further described in Attachment B, this application seeks permission to locate not only digital files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how devices were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

25.     Information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

26.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books,

"chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. For example, I know from experience, as well as information imparted to me by other law enforcement officers, that persons trading in, receiving, transporting, distributing or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents which could tend to identify the origin and possessor of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27. I know from experience, as well as information imparted to me by other law enforcement officers, that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

28. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the

warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

29.     Furthermore, because there is probable cause to believe that computer(s) and storage devices are all instrumentalities of crimes involving child exploitation, they should all be seized as such.

30.     Based upon my experience, as well as information imparted to me by other law enforcement officers, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often law enforcement officers must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

31.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is

often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

   a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

   b. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much

      time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e. Need to review evidence over time and to maintain entirety of evidence. I recognize the prudence requisite in reviewing and preserving, in its original form, only such records applicable to the violations of law described in this affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I submit it would be impractical and infeasible for the

Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to

maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

32. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

33. Based on the foregoing, probable cause exists to believe that that inside the Subject Phone (described on Attachment A), will be found evidence, fruits, and instrumentalities

of a violation of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (described on Attachment B)

34. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

*s/ Justin Stern*

Justin Stern
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this  25th  day of  July  2019

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia Martinez, Assistant United States Attorney.